NOTICE

Decision filed 08/26/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250240-U

NO. 5-25-0240

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* KEHLANI M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-40 |
| | ) | |
| Adriana S., | ) | Honorable |
| | ) | Robert E. Jacobson, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the trial court's evidentiary rulings were not an abuse of discretion and its orders finding the respondent to be an unfit parent and that the minor's best interest warranted termination of the respondent's parental rights were not contrary to the manifest weight of the evidence, we affirm.

¶ 2    Adriana S. (Adriana) appeals from the trial court's order finding that she was an unfit parent and terminating her parental rights to her daughter K.M. On appeal she raises multiple evidentiary issues, claims the trial court should have granted her motion to bar the court-appointed guardian *ad litem* for K.M. from presenting evidence at the fitness and best-interest hearing, claims the court erred in considering the State's best interest report and another exhibit at the best-interest hearing, that the court's findings that Adriana was unfit was contrary to the manifest weight of the evidence,

1

and that the best interest of K.M. warranted termination of her parental rights was not established by a preponderance of the evidence. For the following reasons, we affirm the court's fitness and best interest orders.[1]

¶ 3                                 I. BACKGROUND

¶ 4     Following multiple reports of domestic disturbances, the Department of Children and Family Services (DCFS) took protective custody of K.M. On May 5, 2022, the State filed a petition for adjudication of wardship involving K.M., who was born on March 13, 2022. Adriana is K.M.'s biological mother. Gaige M. is K.M.'s biological father.[2]

¶ 5     The State alleged that K.M. was neglected because either or both of her parents exposed her to domestic violence in the household in violation of section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2020)). The court held a temporary custody hearing on the same date and found probable cause to believe K.M. was neglected and that there was an immediate and urgent necessity to place her in DCFS's custody.

¶ 6     On June 21, 2022, Adriana stipulated that on April 11, 2022, Urbana Police Department officers were called to the home Adriana shared with Gaige M. (Gaige) and K.M. in response to a domestic violence report. Both parents admitted to domestic violence in the home while K.M. was present but provided different factual details. The court entered an adjudicatory order.

¶ 7     On July 19, 2022, following a dispositional hearing, the court entered the dispositional order finding that Adriana was then unfit and unable to parent because of the ongoing domestic

---

[1]Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), our decision in this case was due on or before August 22, 2025, absent good cause shown. The State sought and was given an extension of time in which to file its brief. Consequently, we find good cause for issuing a decision after the due date.

[2]At the conclusion of this case, Gaige M. was found to be an unfit parent, and his parental rights were terminated. He is not a party to this appeal.

violence in the home. The case was reviewed by the court four times between October 2022 and April 2023. On April 25, 2023, the court removed Lutheran Social Services of Illinois, the agency that was providing services for DCFS, from involvement in the case because of a "demonstrated *** pattern of negligence." One Hope United (One Hope) was engaged in all aspects of the case going forward.

¶ 8 On June 16, 2023, One Hope filed a status hearing report with the court. Services were still being set up for Adriana, who reported a domestic violence incident with Gaige on May 31, 2023, when he broke into her home and assaulted her. A warrant for his arrest was issued but was no longer active.

¶ 9 On July 19, 2023, One Hope filed a permanency hearing report. One Hope reported that Adriana had made both reasonable efforts and progress toward reunification. She was engaged in services and visits with K.M. were then unsupervised. On July 27, 2023, the trial court entered a permanency order finding that the permanency goal was return home within 12 months. The court found that Adriana made reasonable efforts but not reasonable and substantial progress toward returning K.M. home. The court emphasized that Adriana must develop the ability to consistently avoid contact with Gaige.

¶ 10 On October 12, 2023, One Hope filed a permanency hearing report, which attached a copy of a family service plan (dated July 14, 2023). In the family service plan, Adriana was rated satisfactory on domestic violence services, rated unsatisfactory on anger management services and compliance with her probation, and rated satisfactory on mental health services, being employed, on parenting classes, and on visits with K.M.

¶ 11 In its permanency hearing report, One Hope indicated that Adriana was making reasonable efforts but not reasonable progress toward reunification. Although Adriana had advanced to having

3

unsupervised visits with K.M., a caseworker discovered a photograph of Adriana, Gaige, and K.M. taken on June 21, 2023. Despite the order of protection Adriana had against Gaige, she brought K.M. to a visit with Gaige. Thereafter, One Hope returned Adriana to supervised visits. When asked, Adriana denied having visits with Gaige until confronted with the date-stamped photographic evidence. One Hope reported its concerns with Adriana's dishonesty and violence between Adriana and Gaige.

¶ 12     In January 2024, One Hope filed both a family service plan (dated January 11, 2024) and a permanency hearing report in advance of the next permanency hearing scheduled January 25, 2024. In the family service plan, One Hope noted that Adriana had completed her parenting and domestic violence classes, was engaged with visitation with K.M., and was still looking for a psychiatrist. One Hope noted that since the previous administrative case review, there had been six more domestic violence incidents between Adriana and Gaige. Adriana completed domestic violence services but was rated as having made unsatisfactory process because of the ongoing domestic violence between her and Gaige. Adriana was tasked with participating in anger management classes. She was ranked unsatisfactory on this plan requirement because while she was engaged in a more general mental health program, she needed to be engaged in a program exclusively addressing her anger management needs. Adriana's progress on her mental health needs was rated satisfactory, and she was rated satisfactory on her parenting classes requirement. Although Adriana reported that she was steadily employed she had not provided documentary proof in the form of pay stubs and so was rated unsatisfactory on this plan goal. While Adriana had been engaged in visitation, her visits were suspended following a December 2023 domestic violence incident in her apartment.

¶ 13     In the permanency hearing report, One Hope found that Adriana had made reasonable efforts but not reasonable progress toward reunification. She was receiving prescribed psychiatric medication from a local provider and was engaged in mental health therapy. She had completed parenting and domestic violence classes and was attending her visits with K.M. and was using appropriate parenting skills. However, there were continued interactions and violence between Adriana and Gaige.

¶ 14     On April 4, 2024, the State filed a motion to terminate Adriana's parental rights. The State alleged that Adriana was unfit on the following three grounds: (1) she failed to maintain a reasonable degree of interest, concern, or responsibility as to K.M.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) she failed to make reasonable efforts during the nine-month period from May 25, 2023, to February 25, 2024, to correct the conditions that were the basis for K.M.'s removal (*id.* § 1(D)(m)(i)); and (3) she failed to make reasonable progress during the same nine-month period toward reunification with K.M. (*id.* § 1(D)(m)(ii)).

¶ 15     The fitness hearing began on August 7, 2024, and took place over several days between then and December 18, 2024. Officer Jaedon Banks testified that he was dispatched to Adriana's apartment about a domestic disturbance on December 15, 2023. Upon arrival, Gaige was in the courtyard and told Officer Banks that he and Adriana were having a relationship argument during which she attempted to take his phone and stabbed and scratched him. Officer Banks observed stab wounds to Gaige's thigh, head, and one of his hands plus multiple scratches on the front and back of his neck and an abrasion on his lip. Gaige informed Officer Banks that he did not want to get Adriana in trouble and that there was an open DCFS case. About four days later, Officer Banks spoke with Adriana by phone, who told him that she had moved towards Chicago with her mother, her visits with K.M. were "on hold," and Adriana declined to speak any further with Officer Banks.

¶ 16    Amy Fellers testified that she was a caseworker for Lutheran Social Services of Illinois and had been assigned to this case from June or July 2022 until April 17, 2023. During that time, there was an order precluding Adriana and Gaige from contacting each other. She had no information that they had ever lived together. She testified that Adriana needed to complete parent coaching, domestic violence services, a mental health assessment, and a substance abuse assessment. In addition, Adriana needed to obtain stable housing and a stable income, cooperate with DCFS, and engage in visits with K.M. During the time that Amy was Adriana's caseworker, Adriana substantially complied with her service plan and cooperated in visitation which began as supervised but later became unsupervised.

¶ 17    Jasmine Hutson (Hutson) testified that she was employed as a caseworker for One Hope and was the caseworker for Adriana and K.M. as of the date of the fitness hearing. She testified that Adriana and Gaige had separate visits with K.M., and that Gaige's visits were suspended in June 2023 after he broke into Adriana's apartment and assaulted her. Adriana had supervised visitation in May and June 2023, then unsupervised visitation in late June 2023, followed by supervised visits in August 2023 through November 2023.

¶ 18    As of April 2023, Adriana's services included domestic violence classes, mental health services, parenting classes, completion of a substance abuse assessment, cooperation with DCFS, and visitation. Although Adriana was engaged in services, none were completed. Visitation was suspended in December 2023 because of the domestic incident to which Officer Banks responded. Hutson testified that she spoke to Gaige following that incident, who informed her that Adriana and Ronnie "Tre" Ross (Tre) had been in the apartment and Tre held him down while Adriana stabbed him. Adriana's version of the incident was that she had moved to Elgin to live with her mother, and while she and Tre were moving more of her belongings from the Urbana apartment,

6

she propped the building's front door open. Gaige entered the building and gained access to her apartment. During a subsequent confrontation, she escaped from his grasp and dropped her phone. She and Tre barricaded themselves in her bedroom. Later they decided to try to "make a run for it" and she made it back to Elgin. At the time of this incident, she had an order of protection against Gaige. Hutson testified that visits were suspended until Adriana contacted the Urbana police who were looking for her. Supervised visits resumed in February 2024.

¶ 19    In August 2023, Hutson obtained a photograph of Adriana, Gaige, and K.M. at an unsupervised visit on June 21, 2023. As the parents were not supposed to be together, she confronted Adriana who initially denied that they had been together but then admitted it after Hutson told her she had seen the photograph. Adriana told Hutson that she had taken K.M. to visit Gaige's grandmother, and he showed up. Adriana also informed Hutson about another incident involving Gaige in July 2023 when Gaige showed up at her car and began banging on her windows. She called 911 and was told to drive further down the road and wait for an officer. No one called her back, so she went to Urbana to do her sales job. When she returned to her vehicle, Gaige was inside. She attempted to drive him to the nearest police station with the intent of blaring her car horn until someone came out of the police station to investigate. At some point, police pulled up behind her car. Gaige spoke with the officers and Adriana "went along" with what he was saying. Adriana was arrested, and when they arrived at the police station, Adriana informed the police of "her plan." Hutson later discussed this incident with Gaige who told her that they had been living together, and when he declined to pay for some expenses, Adriana became mad and attempted to stab Gaige in the neck but he blocked it with his left arm.

¶ 20    Hutson also testified to hearing multiple phone calls Adriana made to Gaige after the October 24, 2023, permanency hearing because Gaige put the calls on speaker. Hutson heard

Adriana ask Gaige to come out to the parking lot for closure and a last goodbye. Hutson stated that Gaige was shaking and crying and said that he was afraid. Previously on October 20, 2023, Adriana told Hutson that she and Tre went for breakfast at a friend's house, then upon leaving she took a wrong turn and ended up on Gaige's street. When Gaige apparently heard her car, he ran out of his house brandishing a knife. She video-recorded Gaige with the knife and sent it to Hutson.

¶ 21     Hutson testified that in May 2023, Adriana lived in Urbana and worked first at Burger King, then for NRG Energy, then returned to Burger King, and then Action Title Services, which was her mother's business. On November 13, 2023, Adriana and her mother moved to Elgin. A permanency review completed in June 2023 reflected Adriana's steady progress with visitation and services. She completed the substance abuse assessment, and no treatment was recommended.

¶ 22     In July 2023, Hutson filed a report indicating that Adriana was making reasonable efforts and substantial progress toward reunification. She described the bond between Adriana and K.M. as "very loving" and stated that Adriana was on track for reunification. Hutson's October 2023 report indicated that Adriana remained on track for reunification and was complying with services. However, Hutson noted that she still had "concerns about the dishonesty and violence" between Adriana and Gaige. In a January 2024 report, Hutson noted that Adriana completed parenting classes, counseling, domestic violence services, and a risk reduction treatment program. She was working with a medical provider to monitor her medications and was regularly seeing a therapist. However, Hutson testified that by late February 2024, she was not close to returning K.M. to Adriana's custody because of "ongoing dishonesty" and continued incidents of domestic violence between her and Gaige.

¶ 23     The State next called Champaign police officer, Ashley Petkunas, who testified that she was dispatched to a Champaign house on October 20, 2023. The homeowner stated that Gaige's

8

ex or current girlfriend showed up at the homeowner's house and was throwing flower pots on her porch. Officer Petkunas identified Adriana as being present at the scene.

¶ 24    Karen Keitzmann testified that she was employed by One Hope and supervised Adriana's visits with K.M. She stated that Adriana was consistent with her visits, and there were no concerns with the visits between May 2023 and February 2024. Keitzmann testified that Adriana was a good parent and that K.M. adored her mother.

¶ 25    Champaign police officer Don McClellan testified that he was dispatched to a reported domestic disturbance on July 21, 2023. He interviewed a witness who informed Officer McClellan that she saw a sports utility vehicle driven by a woman strike a man. At the scene, he spoke with Gaige, who had scratches near his left eye, on the front and sides of his neck, and an apparent arm injury. Gaige told Officer McClellan that he had a non-physical argument with Adriana. He claimed that his daughter struck his left eye with a tablet the previous day. Adriana then told the officer that she and Gaige had a verbal argument with no physical contact. She stated that his injuries were two days old.

¶ 26    Kristin Washington testified that she was employed by Cunningham Children's Home as a case manager and was Adriana's former case manager from January 2022 until February 2024. Adriana informed Washington of the domestic violence incidents with Gaige, including the December 2023 incident. She testified about a phone incident on July 27, 2023, where Gaige called Adriana's phone, and she could hear her screaming over the phone. She called the Urbana Police Department to report the incident.

¶ 27    After the State's witnesses completed their testimony, the guardian *ad litem* (GAL) called Adriana, K.M.'s foster mother, and Gaige's grandmother. Adriana's attorney made a motion to bar the GAL from presenting evidence, which the trial court denied. Adriana testified about the

July 21, 2023, Champaign incident. After she first encountered Gaige in Champaign, she called the police and then continued her door-to-door sales work in Urbana. Upon returning to her car, Gaige was inside. Adriana testified that she did not have the best reputation with the police and did not know what to do. She decided to drive Gaige to the police station but told him they were going to Walmart. Their argument in the car escalated. She said that Gaige was not injured during the fight, and the cut over his eye that was sustained during his own door-to-door sales work.

¶ 28    Adriana also testified about the October 20, 2023, incident when she and Tre had been to the home of a friend. Upon leaving, she made a wrong turn and ended up on Harvard Street in Urbana. Adriana testified that she did not know if she was aware that Gaige was living with his sister in a house on Harvard Street when she made this wrong turn. She stated that her car had stopped a few houses down from his sister's house when Gaige pulled a knife on her.

¶ 29    Finally, Adriana testified about the December 15, 2023, incident at her Urbana apartment when she was moving some of her possessions from the Urbana apartment to Elgin. Tre was with her in the apartment. Gaige entered and "swung on us." Her phone was knocked out of her hand. She testified that the situation had escalated, and she and Tre ran into her bedroom to barricade themselves. They stayed in the room listening to Gaige scream, yell, and break things, until he left. She did not call the police, because she did not want to wait for them to show up and just wanted to get back to her mother's home in Elgin. She confirmed that the police had called her, but she failed to respond until DCFS told her that visitation with K.M. was "at stake" until she contacted police.

¶ 30    Adriana confirmed that as of July 2023, she had been ordered by the court to have no contact with Gaige but admitted that she called Gaige after their October 2023 court hearing. She also took K.M. to visit Gaige at his grandmother's house. The GAL asked her about contact with

Gaige by phone while in the courthouse for a hearing in January 2024. She confirmed that she was asked to produce her phone in court, and that there were communications on that phone between her and Gaige. She admitted to calling him that date but said that doing so was an "awful mistake."

¶ 31    The GAL then asked Adriana questions about the July 21, 2023, incident and the cut above Gaige's eye. The GAL played a video that was taken inside her Urbana apartment with Gaige present. On examination by the State, she confirmed that the bleeding from the cut above Gaige's face was accurately depicted on the video. She confirmed that there was an order of protection in place on that date. She testified that her longest employment was during K.M.'s pregnancy when she worked at a local grocery store as a cashier. She said that she maintained the Urbana apartment because she needed a local home to have home visits with K.M.

¶ 32    The GAL called Faith Whitman, K.M.'s foster mother, who testified that she knew Gaige from when they worked together at a Champaign restaurant. Whitman testified that she first met Adriana and K.M. in April 2022 when she was asked by Gaige if she could babysit. Adriana and Gaige were then living together in Urbana. She babysat K.M. in her home for the next few days and said that it seemed that Adriana and Gaige needed time "just to themselves." Whitman finally contacted Adriana and Gaige to tell them that because she was missing so much work, she needed them to take K.M. back. Neither offered to pick up K.M., so Whitman drove her back to their Urbana apartment. Later when K.M. was taken by DCFS, Gaige asked Whitman if she could be K.M.'s foster parent. She agreed and has been K.M.'s foster parent since May 4, 2022. For the first two months that she had K.M., she supervised Adriana's visits. In the second month of Adriana's visitation, Whitman reached out to DCFS to say that she was no longer comfortable supervising the visits, noting that Adriana was engaging in passive-aggressive behavior. She

11

testified about a Facebook post made by Adriana in June 2022 that she found to be threatening in nature. She also received the following text message from Adriana on June 21, 2022:

"Okay, so DCFS made it clear to both of us that they're not removing [K.M.] yet. You know that myself and Gaige, I'm assuming that is, because I'm assuming that he's feeling because I don't speak to him, despise you. You know that we don't want [K.M.] with you. Why hold onto my kid? Why not just tell DCFS you don't want her any more? Why make it so hard? Do the right thing, Faith, like come on, imagine how you would feel if this was someone else doing this to your child."

Whitman testified about the negative interactions she had with Adriana when K.M. had surgery at a pediatric hospital for club foot. Security had to get involved and stayed with Whitman and K.M. while they were at the hospital. She testified that she was fearful that Adriana would harm one of them. Whitman stated that she was open to the idea of adopting K.M. She testified that she made reports about Adriana to DCFS.

¶ 33   The GAL also called Rose Klein (Klein), Gaige's grandmother, who testified that on June 21, 2023, Adriana, Gaige, and K.M. arrived at her house together. Klein said that they were all happy. She knew that they were not supposed to be together because of the order of protection. Klein next testified about July 21, 2023, when she spoke with Gaige, who told her that Adriana cut his arm when they were together in a car because he refused to give her his paycheck so she could get her nails and eyebrows done. She identified a photograph that Gaige sent her that date depicting the cut arm. Klein also testified about contact she had with Adriana and Gaige on August 4, 2023. At 11:35 p.m., Adriana knocked on her front door and asked for help with Gaige who was in her car and suffering seizures. She testified that Gaige was not responsive, and so she called 911. Adriana asked her why she was calling 911, and she told her that Gaige did not have a history

12

of seizures. Adriana then told her that he had had seven seizures that day before she brought him to Klein's house. She told Klein that she did not seek medical help for Gaige because they were not supposed to be together. Adriana removed Gaige from her car, laid him on the ground, and he had another seizure. Klein asked her to leave after the seizure ended, and she called for an ambulance. Klein followed the ambulance to Carle Hospital. Approximately three days later, Gaige told Klein what preceded his seizures. He stated that at Adriana's apartment she got mad at him and repeatedly punched him in the head. Adriana's attorney objected to this testimony, but the court overruled the objection stating that the testimony was clearly against Gaige's interest.

¶ 34    Klein next testified about being at the October 24, 2023, court hearing with Gaige. After the hearing, Gaige received multiple phone calls from Adriana, which he placed on speaker, so Klein heard them. Adriana was asking Gaige to come outside to see her. He told her that they had nothing to discuss. The One Hope caseworker, Hutson, was present during these calls. Gaige then spoke with Hutson, provided her with multiple text messages, and tearfully told her he feared that if he met with her outside the courthouse, she might kill him.

¶ 35    Klein also testified to overhearing Adriana calling Gaige from the courthouse bathroom after the January 2024 hearing, stating that everyone was against her and wanted her to lose her daughter. Klein also testified to multiple conversations she had with Gaige by phone and in person about the "plan" he and Adriana had about this case. Gaige planned to surrender his rights to K.M., and that when Adriana got K.M. back, she would bring Gaige back into their lives to be a family again. Gaige also told his grandmother that he was no longer participating in the case because Adriana was making death threats to him and his current girlfriend. Adriana made it clear that if she lost her daughter in this case, that she and Gaige will die. When Klein agreed to come forward

to the One Hope caseworker, Hutson, Adriana texted Klein that she would never see K.M. again and that she had now an enemy.

¶ 36 Klein testified that Adriana and Gaige lived together "[q]uite a few" months in 2023. Both Adriana and Gaige told her that they were living together. At the end of 2023, Gaige told Klein he was moving in with a friend in Thomasboro because he had been "stabbed in his hip and down through his thigh." Until this late 2023 conversation, Klein indicated that she was under the impression that Adriana and Gaige were living together. The GAL asked Klein who stabbed Gaige in his hip and thigh, and she stated that it was Adriana.

¶ 37 Adriana testified at the fitness hearing on her own behalf. When K.M. was born in March 2022, Gaige lived with Adriana. She testified that after the first night with K.M., Gaige "was pretty much not there." She said that they frequently argued because she did everything by herself. On the night of the fight that led to DCFS involvement, Adriana had just gotten home from Chicago where K.M. had her first club foot medical appointment. When she got home, she was extremely tired and needed to sleep. She woke Gaige from a nap which made him mad, and the argument escalated.

¶ 38 Adriana testified about the domestic violence classes she took, and the coping mechanisms she learned through those classes. She also testified about parenting classes she completed and her work with a parenting coach. Adriana said that she learned various parenting skills that she utilized during visitation. She also has been in mental health therapy throughout the duration of this case and was prescribed medication for anxiety that she still takes. While she has never taken specific anger management classes, Adriana testified that she receives instruction and guidance on the topic in her mental health therapy and domestic violence and parenting programs.

14

¶ 39　She testified that Gaige is no longer a part of her life. She currently lives in Arlington Heights. She denied that she threatened anyone and denied that she and Gaige had a plan where he would surrender his parental rights and she would regain custody of K.M. and then bring him back into the family. She denied that she asked Gaige for his paycheck on July 21, 2023, and denied that she attacked him with a knife, stating that she did not know what happened to his arm. Adriana denied that she struck him in the head on the day when he had the seizures and said that when he showed up at her apartment, he appeared to be under the influence of some drug, and Gaige informed her that he had taken multiple Percocet narcotic pills. She also testified about the October 20, 2023, incident on Harvard Street, stating that she took a wrong turn, ended up on that street, "and then it all just escalated from there." She stated that she was not arrested, but Gaige was. Adriana also testified that Gaige broke into her apartment on December 15, 2023, and assaulted her and her friend, Tre.

¶ 40　Adriana's attorney asked her if she could provide K.M. with a good, long, and safe life. She stated:

> "I know for a fact that if [K.M.] were to come home today, I would not be ready. But I know for a fact that if I was granted just the slightest blessing of more, then yes, I 100 percent would be 100 percent able to take care of [K.M.] and have everything she needs."

¶ 41　On cross-examination by the State, Adriana acknowledged that she did not have any visitation with K.M. in January 2024 because of a "mix-up with the police." However, during the nine-month period of May 26, 2023, to February 25, 2024, she did have some unsupervised visits with K.M. during the summer months. Adriana confirmed that she had only recently completed probation for a domestic battery charge in October 2021 where Gaige was the victim.

15

¶ 42    The GAL cross-examined Adriana about her probationary period, which was to last 12 months and commence on January 19, 2022. However, she did not complete her probationary period until March 2024. Adriana admitted that in December 2022, a petition to revoke her probation was filed but said that the petition to revoke was because she could not afford her court fines. She admitted to failing a drug test and not providing verification of public service hours. Adriana acknowledged that she was resentenced on April 28, 2023, and received another 12 months of probation.

¶ 43    The State called Tre, who testified that he had known Adriana since high school. Tre was asked about the events of December 15, 2023. Earlier that day, he and Adriana were filling DoorDash orders to make some money. While they were doing that, Gaige was "blowing up her phone" and he suggested that she ignore him. After they decided they were done with DoorDash work, Adriana dropped Tre off at his home, about 10 to 15 minutes from her apartment. About one hour later, Adriana picked Tre up and drove first to a mutual friend's house and then to her apartment because she wanted to get her clothes and to get her phone that was in Gaige's possession. During the hour that he and Adriana were apart, he communicated with her by social media or by a second phone he had given her, saying that Gaige was putting her in danger, chased her around a parking lot, and took her phone. When they arrived at Adriana's apartment, Gaige was already there and was unhappy that she brought Tre with her. Tre testified that he was aware that there was a court order to keep Adriana and Gaige apart, and testified that Gaige lived at Adriana's apartment, but only for short periods of time. He stated that he did not ask Adriana if Gaige lived there because Tre himself frequently spent the night at Adriana's apartment. On that evening, Gaige tried to fight Tre, but Adriana pushed Gaige away. Then Adriana and Gaige began talking but eventually got "into a really heated argument which led to Gaige putting his hands up

16

on her." Tre confirmed that eventually he and Adriana were barricaded in her bedroom but said that they did have a cell phone. No calls were ever made to the police. Tre testified that they were able to get Gaige to calm down enough so they could exit the bedroom. Gaige still had Adriana's phone, but Tre got it back.

¶ 44 The State then asked Tre to testify about the October 20, 2023, incident on Harvard Street. He testified that he and Adriana had left "Tay's" house where they had both spent the night. Upon leaving Tay's house, Adriana drove to Gaige's house. He testified that he did not know that she intended to do that. As they were parked outside of Gaige's house, Adriana began honking the horn on the car. Tre confirmed that Gaige was not outside of the house when they pulled up. Gaige came out of his house and was holding a knife. Tre testified that both Adriana and Gaige were recording each other. Gaige approached the car and reached in and slapped both Adriana and Tre. Then Adriana exited her car, and she and Gaige were screaming and yelling at each other, and Gaige was threatening her with his knife. Police were called by Gaige's aunt. The police questioned Adriana and Tre and then were told they were free to leave.

¶ 45 Tre testified that he was also present on the night that Gaige had the seizures. He said that this occurred before the Harvard Street incident. Gaige was at Adriana's apartment and the two eventually got into an argument in the living room. Gaige was there with a female called No-No. All four of them had worked together on a job with Rushmore Energy. He testified that Gaige was "ingesting things" all night. During the argument, Gaige repeatedly asked Adriana to get back together with him. Eventually Adriana left the apartment to go on a drive alone. Gaige remained in her apartment with Tre and No-No. Gaige had multiple "spastic seizures" that evening. Tre said that they wanted to take Gaige to the hospital but decided against it because Adriana did not want

17

to be seen with Gaige because of the court order. So, they drove Gaige over to his grandmother's house.

¶ 46    Tre also testified that Adriana called him with her "one call" after she was arrested for an alleged domestic battery to Gaige on July 21, 2023. Later while she was in jail, she told Tre that she and Gaige had been working together that day and then he got mad about something, and an argument ensued. Adriana told Tre that she had repeatedly told Gaige to get out of her car and eventually told him that if he did not exit the vehicle, she was going to stab him with a small paring knife. Then he lunged at her in the car, and she stabbed him in the arm.

¶ 47    The GAL asked Tre additional questions to clarify his testimony. Tre said that on the day of the Harvard Street incident, they sat outside of Gaige's house for 10 to 15 minutes. He stated that they knew that Gaige's new girlfriend was also in the house. Tre clarified that from the beginning of the summer in 2023 until December 15, 2023, Gaige was sometimes living at Adriana's apartment off and on.

¶ 48    After Tre's testimony, Adriana was called to provide surrebuttal testimony. She testified that from the summer of 2023 until early 2024, Gaige never stayed overnight and did not live with her. She testified that although they both had similar energy company jobs, they did not work together. Adriana acknowledged that she did speak with Tre when she was in jail in July 2023 but denied that she told Tre she stabbed Gaige in the arm. Adriana testified about the Harvard Street incident and denied that they sat outside of the house and reiterated that Gaige was outside when they arrived. She confirmed that Gaige slapped her and Tre.

¶ 49    The trial court held final arguments on the fitness hearing on December 18, 2024. The court noted that Adriana completed various required services, maintained housing, and was largely employed. While she engaged in consistent visits with K.M., she was unable to fully advance to

18

longer and unsupervised visits except for a few the previous summer. The court found that there was no question that Adriana loved K.M., but that there were two reasons that Adriana was not close to being reunited with K.M.: "One, ongoing dishonesty by Adriana about her contact with Gaige; and two, ongoing incidents of domestic violence between Adriana and Gaige." The court noted that during the specific nine-month period at issue, there were six known incidents of contact between Adriana and Gaige, plus the seventh contact when she phoned Gaige from the courthouse bathroom. The court detailed each of these incidents and noted that Adriana admitted to all seven, even though she provided different factual details about the incidents. The court specifically noted that it found the testimony of both Rose Klein and Ronnie "Tre" Ross to be credible. The court found that Adriana's testimony was not credible, and stated:

> "So, again, all of this, even if it were just the seven incidents, not, as the Court suspects, likely much more contact than that, unfortunately, that's just more than enough to show that Adriana doesn't get it. And she was willing to repeatedly violate the Court's orders and was certainly not applying what was attempting to be taught to her in the plenty of services that she took and even completed."

¶ 50    The court concluded that Adriana maintained a reasonable degree of interest and concern for K.M., but found that the State established by clear and convincing evidence that Adriana failed to maintain a reasonable degree of responsibility as to K.M.'s welfare:

> "Adriana has by her repeated actions to disregard the Court's orders in this case and in the OP case referenced earlier by continuing to have contact with Gaige, continuing to have incidents of domestic violence with him, and then concealing, minimizing, and lying about it, she's demonstrated a clear lack of

19

responsibility as to [K.M.'s] welfare and, for that matter, a lack of responsibility as to her own betterment, which would, of course, also be to the benefit of [K.M.]"

The court also found that the State established by clear and convincing evidence that Adriana failed to make reasonable efforts to correct the conditions that were the basis for K.M.'s removal during the specific nine-month period. Finally, the court concluded that the State established by clear and convincing evidence that Adriana failed to make reasonable progress toward the return of K.M. during the specific nine-month period.

¶ 51 Before the best-interest hearing, One Hope filed a report, written by Hutson. One Hope reviewed the history of the case and summarized the services in which Adriana participated. As of the date of the report, Adriana said that she would not be renewing her Arlington Heights lease and would move back in with her mother. Hutson indicated that visits had been reduced to one hour per month because of the goal change to substitute care pending termination of parental rights. Based upon case aide reports, Adriana had been struggling with parental redirection and emotional regulation. She was reported to be "pushy and hostile" towards foster parent Whitman during the recent administrative case review. The reviewer reported that Adriana "tried to engage [Whitman] in a heated back and forth debate about visitation and the mother's claims that [Whitman] is not answering her calls. When [Whitman] did not engage, the mother became upset and ended the call." In conclusion, One Hope indicated that it believed it was in K.M.'s best interest to remain in her current placement. Whitman is willing to adopt K.M. and provide for her needs.

¶ 52 The trial court held the best-interest hearing on February 24, 2025, and February 27, 2025. Rebecca Jo Hoover testified that she is a family support specialist employed by One Hope. Hoover's role is to supervise visits. She has been in this role for 10 months. She testified that she had been to Adriana's apartment in Arlington Heights. Adriana told Hoover that she lives alone in

the apartment. However, Hoover noted that Adriana had three separate accounts listed on what was either a Disney or a Netflix account. There were accounts listed for Adriana, K.M., and "my sweetheart." One time during the 10 months, Adriana had to retrieve her apartment keys from someone's truck. Adriana had informed Hoover that her vehicle was being repaired, and so Hoover believed that the truck did not belong to Adriana. Hoover testified that she had learned in the summer of 2024 that Adriana had a friend named Josh who loaned her a car to come down to Champaign for visits. Josh's Jeep was her only form of transportation from October 2024 through February 2025.

¶ 53    The State called Hutson who testified that she had just become aware of an incident involving Adriana and the Arlington Heights Police Department in December 2024. Hutson said that in the last couple of months One Hope had reason to believe that Adriana may be living with someone. In late summer 2024, Hutson was walking inside the courtroom for a hearing and noticed a green Jeep with a male driving it. The vehicle was significant because Hutson had previously seen Adriana driving that green Jeep for a visit Hutson supervised before the court hearing. At that time, Adriana informed Hutson that the Jeep belonged to a friend. After seeing the man driving the green Jeep, Hutson asked Adriana who the man was. She told Hutson that his name is Joshua David and he is a friend. Over time, Hutson became concerned that Adriana was dating Joshua David. Hutson testified that another individual had shared photos of Adriana with Joshua that were suggestive that they were engaged in a relationship. So, Hutson directly asked Adriana about her relationship. Adriana stated that she was single and "not really" involved in a relationship. When pushed for clarification, Adriana then said she was not involved in a relationship. Hutson explained that because of the nature of what their agency does, it is important to learn the identity of any paramour because that person would have direct contact with K.M.

¶ 54    Hutson testified about a recent visitation session she monitored. K.M. had an accident and needed to be changed. Hutson directed Adriana to take K.M. to the bathroom to change her, but Adriana initially refused and attempted to change her on top of a table. Hutson insisted, and eventually Adriana reluctantly complied. Hutson also testified that there was a possibility that Adriana may be moving back in with her mother. She had been working at a Portillo's restaurant but recently changed jobs and was working at Courtyard by Marriott. Hutson described the bond between K.M. and her foster parent. During observed visits, K.M. refers to Whitman as her mom, and goes to her for food, drink, comfort, and direction.

¶ 55    On cross-examination, Hutson clarified that while there is no restriction on a parent becoming involved with a paramour, One Hope's policy is that for the safety of the child in care, a background check must be conducted, and the paramour must be observed with the child.

¶ 56    Adriana called Dr. Judy Osgood, who testified that she had a contract with DCFS since 1999 to psychologically evaluate children, adolescents, and adults who have DCFS cases, including parenting capacity and bonding assessments. She conducted a bonding assessment between Adriana and K.M. She observed them together for approximately two hours. She also interviewed Adriana individually for approximately 90 minutes, and interviewed Becky Hoover, the visitation supervisor. Dr. Osgood reviewed multiple photographs of Adriana and K.M. together. Based upon the photographs, Dr. Osgood said that Adriana and K.M. are bonded. She described Adriana's strengths as being very supportive. They played together, talked and interacted during the visit, which Dr. Osgood described as nurturing and responsive. She testified that K.M. was happy, referred to Adriana as Mom, and was eager to play with her mother. She noted no anxiety or discomfort. When Whitman showed up at the end of the visit, K.M. also referred to her as Mom and testified that Adriana was empathetic and did not react negatively.

¶ 57 Faith Whitman next testified at the best-interest hearing that she had been K.M.'s caregiver since May 4, 2022. Whitman works full time and while at work, K.M. is cared for by Whitman's mother. K.M. also has a relationship with Whitman's father. K.M. has her own bedroom and recently got a kitten. She has relationships with Whitman's siblings, her aunt, and her fiancé. Whitman also testified that K.M. has relationships with Gaige's family, and she intends to maintain those relationships. Whitman said that Adriana has never asked to have K.M. interact with her biological family. If Whitman is allowed to adopt K.M., she testified that she would still allow interaction with Gaige's family, and would consider, if asked, allowing interaction with Adriana's family. However, Whitman stated that she did not currently see any chance of contact with Adriana in the near future.

¶ 58 Adriana testified that she has not been notified about K.M.'s medical appointments. Most recently, she learned that she had a club foot appointment and was not informed. She also testified about her recent interactions with K.M., and that K.M. asks her to come home with her. Adriana says that Joshua never lived with her but had on a few occasions spent the night. She denied that they ever had a romantic relationship, and so she never informed DCFS about him. She testified that she did not have a car, and Joshua knew how important visitation was for her, so he allowed her to use his car. Adriana testified that she is still in mental health therapy, domestic violence treatment, and continuing to work on parenting skills. She is enrolled in courses at College of Du Page and is pursuing a degree in psychology. Adriana testified that she wants to give her daughter the life she did not have as she grew up in foster care.

¶ 59 On cross-examination, Adriana confirmed that she does not have a car and uses the Chicago Transit Authority for transportation. She confirmed that there was a situation in December 2024, when Joshua's car was towed. She testified that there were issues with her landlord and that this

23

was the third time a friend's car was towed. She has not had her own car since the spring of 2024. Throughout this case, Adriana testified that she has lived in five places.

¶ 60    Following arguments of counsel, the trial court found that the State had established by a preponderance of the evidence after considering each statutory factor that the best interest of K.M. would be served by terminating both Adriana's and Gaige's parental rights. This appeal followed.

¶ 61                                    II. ANALYSIS

¶ 62    On appeal, Adriana raises multiple evidentiary rulings, a claim that the trial court erred in allowing the GAL to present evidence at both the fitness and best-interest hearings and claims that the trial court erred in allowing the introduction of two documents into evidence at the best-interest hearing, and she contests the fitness and best-interest rulings.

¶ 63                      A. Plain Error Review of Forfeited Issue

¶ 64    Adriana first argues that the trial court improperly allowed Rose Klein to provide hearsay testimony. Klein testified that Gaige told her Adriana stabbed him on July 21, 2023.

¶ 65    The State argues that Adriana forfeited this argument on appeal. A claimed error will generally be forfeited if the party fails to object at trial. *In re M.W.*, 232 Ill. 2d 408, 430 (2009). A motion *in limine* may substitute for a trial objection. *People v. Boclair*, 129 Ill. 2d 458, 476 (1989). In a Juvenile Court Act case, it is not necessary to file a post-adjudication motion to preserve the issues. *In re M.W.*, 232 Ill. 2d at 430 (citing *In re W.C.*, 167 Ill. 2d 307, 327 (1995)). On appeal, the reviewing court may consider forfeited claims pursuant to the plain error doctrine. *In re Andrea D.*, 342 Ill. App. 3d 233, 242 (2003); Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error rule is rarely applied in civil cases. *In re P.J.*, 208 IL App (3d) 170539, ¶ 11. However, parental rights constitute a substantial right, and plain error analysis can be used in those cases. *In re J.J.*, 201 Ill.

24

2d 236, 246-47 (2002). If the party makes no argument for plain error review, the matter is forfeited. *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010).

¶ 66     In her brief on appeal, Adriana raised hearsay concerns about Klein's testimony but did not raise plain error review. In her reply brief, she acknowledges that her trial attorney did not object to Klein's testimony during the fitness hearing, and had intended to argue plain error, but her appellate attorney was distracted by brief length rules and overlooked the argument. We find that the issue was forfeited by the attorney's failure to object during the fitness hearing, and failure to raise the issue as plain error on appeal. *Hillier*, 237 Ill. 2d at 545-46; see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 67     We also find that given the facts of this case; Adriana could not have satisfied either prong of the plain error doctrine because there was no clear or obvious error. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (a reviewing court may consider unpreserved error when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence" (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005))). Here, Klein's testimony about a conversation she had with Gaige, her grandson, constituted a statement by a party opponent, and thus was not hearsay. See Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015).

¶ 68                                    B. Evidentiary Rulings

¶ 69     Adriana takes issue with 10 of the trial court's evidentiary rulings during the fitness and best-interest hearings. In Illinois, the rules of evidence in civil cases also apply to parental rights

termination proceedings. *In re J.B.*, 346 Ill. App. 3d 77, 81 (2004); 705 ILCS 405/2-18(1) (West 2022) ("The standard of proof and the rules of evidence in the nature of civil proceedings in this State are applicable to proceedings under [the Juvenile Court Act of 1987]."). Hearsay evidence is typically not admissible. Ill. R. Evid. 802 (eff. Jan. 1, 2011). "However, a statement offered for some reason other than for the truth of the matter asserted is generally admissible because it is not hearsay." *People v. Hill*, 2014 IL App (2d) 120506, ¶ 51 (citing *People v. Evans*, 373 Ill. App. 3d 948, 964 (2007).

¶ 70   We review the trial court's ruling to admit or deny evidence during a parental rights termination hearing under the abuse of discretion standard. *In re J.B.*, 346 Ill. App. 3d at 80. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 71                    1. *Officer McClellan's Testimony*

¶ 72   During the fitness hearing, Officer McClellan testified about his investigation into the July 21, 2023, domestic disturbance call involving Adriana and Gaige, stating that he was dispatched based upon a witness's call to police that a couple were fighting in a vehicle. The court overruled Adriana's hearsay objection on the basis that the statement at issue was only offered "to show what [the officer] did, not for the truth of the assertion."

¶ 73   An exception to the hearsay rule is when the testimony involves "the course of an investigation." *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 23. Law enforcement officers speak to witnesses and gather relevant information. A police officer is allowed to testify about investigative steps taken, including describing the events that lead to an arrest if the evidence satisfies some relevant nonhearsay purpose. *People v. Jura*, 352 Ill. App. 3d 1080, 1086 (2004). This type of

26

testimony is not hearsay because it is offered to explain what investigation the officer conducted and is not used as evidence of the defendant's guilt. *Id.* at 1088. Although the inference to be drawn from such testimony might be that the information received motivated the officer's subsequent conduct, it is nonetheless not hearsay because it is drawn from the officer's personal knowledge. *People v. Gacho*, 122 Ill. 2d 221, 248 (1988).

¶ 74     In response to Adriana's hearsay objection, the State responded that Officer McClellan's testimony was only to show his course of conduct in investigating a possible domestic disturbance involving Adriana and Gaige. The trial court agreed. We conclude that the trial court did not abuse its discretion in denying Adriana's hearsay objection. *In re J.B.*, 346 Ill. App. 3d at 80.

¶ 75     2. *Rose Klein's Testimony About Gaige's Plan to Surrender His Parental Rights*

¶ 76     Klein testified that her grandson Gaige told her that he planned to surrender his parental rights, and that when Adriana regained custody of K.M., she would bring Gaige back into the household. Adriana's attorney objected to this hearsay statement.

¶ 77     We note that at this point in the case, Gaige had ceased virtually all activities involved with his service plan objectives and visitation with K.M. He also rarely appeared at court hearings. However, he still had counsel who represented him at every hearing. Because he did not surrender his parental rights, the State bore the burden to establish that he was an unfit person by clear and convincing evidence.

¶ 78     We find that Klein's testimony amounted to a statement by a party opponent—Gaige—and thus, was not improper hearsay. Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015). The trial court did not abuse its discretion in denying Adriana's hearsay objection. *In re J.B.*, 346 Ill. App. 3d at 80.

¶ 79     3. *Rose Klein's Testimony About Gaige's Relocation to Thomasboro*

¶ 80    Klein testified that her grandson moved to Thomasboro because Adriana stabbed him "in his hip and down through his thigh." Again, we find that Klein's testimony amounted to a statement by a party opponent—Gaige—and thus, was not improper hearsay. Ill. R. Evid. 801(d)(2). Moreover, even if this was improper hearsay, it was cumulative of Officer Banks's testimony about her investigation of the December 15, 2023, domestic violence incident between Adriana and Gaige. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 28. The trial court did not abuse its discretion. *In re J.B.*, 346 Ill. App. 3d at 80.

¶ 81    4. *Rose Klein's Testimony About Gaige's Reasons for Stopping Case Participation*

¶ 82    Klein testified that Gaige told her he stopped his participation in the case because he and his family were threatened by Adriana. Klein's testimony amounted to a statement by a party opponent and thus, was not improper hearsay. Ill. R. Evid. 801(d)(2). The trial court did not abuse its discretion. *In re J.B.*, 346 Ill. App. 3d at 80.

¶ 83    5. *Jasmine Hutson's Testimony About Hearing a Phone Call*

¶ 84    During the fitness hearing, Hutson testified that she was present when Adriana called Gaige's cell phone which he had set to speakerphone mode. At trial, and on appeal, Adriana claims that Hutson's testimony should have been barred because her testimony violated Illinois eavesdropping rules. Illinois defines an eavesdropping device as "any device capable of being used to hear *** oral conversation *** whether such conversation *** is conducted *** by telephone, or by any other means." 720 ILCS 5/14-1(a) (West 2022). Here, the trial court overruled Adriana's objection based on the eavesdropping statutes, concluding that this factual scenario did not constitute eavesdropping. While caselaw supports the trial court's ruling that Hutson did not use an eavesdropping device (see *People v. Brown*, 131 Ill. App. 2d 244, 248-49 (1970)) and had no intent or plan to listen in on Adriana's phone plea, there is no question that Adriana likely was

28

unaware and thus did not consent to being overheard telling Gaige that she wanted to have a meeting with him. However, to the extent that this "evidence" was inadmissible as obtained in violation of the Illinois eavesdropping statutes, we find that any error by the trial court in allowing Hutson to testify that she overhead Adriana's attempt to meet with Gaige was ultimately harmless. Adriana herself testified about making that phone call during the hearing, and this phone call was just one of multiple instances of Adriana's violation of the court's no-contact order between her and Gaige. Having carefully considered the trial court's fitness order and statements made on the record, we find that to the extent that allowance of Hutson's testimony was erroneous, any error was decidedly minimal and harmless.

¶ 85                6. *Rose Klein's Testimony About Gaige's Seizure Incident*

¶ 86    Klein testified at the fitness hearing that Gaige told her that before he suffered multiple seizures, Adriana had been repeatedly punching his head. At the time of the seizures incident, the parties were under a no-contact order. Thus, we find that Klein's testimony amounted to a statement by a party opponent, and thus, was not improper hearsay. Ill. R. Evid. 801(d)(2). The trial court did not abuse its discretion in denying Adriana's hearsay objection. *In re J.B.*, 346 Ill. App. 3d at 80.

¶ 87    7. *Rose Klein's Testimony About Gaige's Conversation With Jasmine Hutson*

¶ 88    During the fitness hearing, Klein testified that she heard Gaige "open up" to Hutson, provide her with text messages he received from Adriana, and tearfully tell Hutson that he was fearful for his life. Adriana objected based on relevance, and the trial court ruled that this statement was relevant to the case because of the domestic violence relationship between Adriana and Gaige. On appeal, Adriana argues that Gaige's "emotional response" was not an issue in this case. We disagree. Illinois Rule of Evidence 803(3) provides: "A statement of the declarant's then existing

29

state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is not excluded by the hearsay rule even if the declarant is available as a witness. Ill. R. Evid. 803(3) (eff. Jan. 25, 2023). Thus, we do find that the trial court abused its discretion in allowing this testimony.

¶ 89   8. *Jasmine Hutson's Testimony That Gaige Confirmed the December 2023 Incident*

¶ 90   Hutson testified that Gaige confirmed the events of the December 2023 stabbing incident at Adriana's apartment. As Gaige was the declarant, we find that Hutson's testimony amounted to a statement by a party opponent, and thus, was not improper hearsay. Ill. R. Evid. 801(d)(2). Moreover, even if admission was improper, the evidence was cumulative to testimony of Officer Banks. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 28. We find that the trial court did not abuse its discretion in denying Adriana's hearsay objection. *In re J.B.*, 346 Ill. App. 3d at 80.

¶ 91   9. *Jasmine Hutson's Testimony That Adriana Was Not Close to Reunification*

¶ 92   The trial court overruled Adriana's objection to Hutson's statements that because of Adriana's ongoing dishonesty and commission of domestic violence, she was not close to reunification with K.M. Adriana makes no argument in her brief as to how the trial court erred in overruling her objection. Lay witnesses are allowed to provide opinions if they are "rationally based on the perception of the witness." Ill. R. Evid. 701(a) (eff. Jan. 1, 2011). As part of Hutson's job was to observe and opine about a parent's progress and efforts in a case, we conclude that Hutson's conclusion was a proper lay witness opinion. Therefore, the trial court did not abuse its discretion in allowing Hutson's testimony

¶ 93   10. *Admission of June 2022 Facebook Messages*

¶ 94   Adriana also contends that the trial court erred in overruling her relevancy objection to a series of Facebook messages dated in June 2022. " 'Relevant evidence' means evidence having

30

any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). The court found that the Facebook messages were relevant about whether Adriana maintained a reasonable degree of interest, concern, or responsibility towards K.M. We find no basis to conclude that the trial court abused its discretion on this evidentiary issue.

¶ 95                    C. Presentation of Evidence by the GAL

¶ 96    Adriana takes issue with the court-appointed GAL's ability to present evidence on K.M.'s behalf. The trial court denied her motion *in limine* seeking to bar the GAL from introducing any evidence. On appeal, we review the denial of Adriana's motion *in limine* for an abuse of discretion. See *Passafiume v. Jurak*, 20242 IL 129761, ¶ 18.

¶ 97    We note that the record on appeal establishes that on May 5, 2022, the trial court appointed attorney Ellen Beattie as both GAL and attorney for the minor. She was specifically authorized to act for the minor in any legal aspect pursuant to the order of appointment. The order contained a list of categories of discovery and involvement with professionals involved in this case and specifically stated that her authorization to act on the minor's behalf was not limited to the categories on that list.

¶ 98    Section 1-5 of the Juvenile Court Act of 1987 provides guidance on this issue. The minor who is the subject of a Juvenile Court Act proceeding has "the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, [and] to examine pertinent court files and records." 705 ILCS 405/1-5(1) (West 2022). "No hearing on any petition or motion filed under this Act may be commenced unless the minor who is the subject of the proceeding is represented by counsel." *Id.* "[I]f a guardian *ad litem* has been appointed for the minor *** and the guardian *ad litem* is a licensed attorney at law of this State ***, the court may

31

not require the appointment of counsel to represent the minor unless the court finds that the minor's interests are in conflict with what the guardian *ad litem* determines to be in the best interest of the minor." *Id.*

¶ 99    The Illinois Supreme Court briefly addressed the issue of what a court-appointed GAL and attorney for the minor child may do during a juvenile court case, *In re D.S.* The court stated that section 1-5 of the Juvenile Court Act provides that the minor "has the right to be represented by counsel, to be present, and to be heard." *In re D.S.*, 198 Ill. 2d 309, 332 (2001) (citing 705 ILCS 405/1-5(1) (West 1998)). Most importantly, the Illinois Supreme Court stated: "Further, as a party to the termination action, the GAL, on behalf of [the minor], may question witnesses, present evidence, examine pertinent court files and records, and make arguments to the court." *Id.* at 332-33 (citing 705 ILCS 405/1-5(1) (West 1998)).

¶ 100   We find that the trial court did not abuse its discretion in denying Adriana's motion *in limine*. As statutory provisions and case precedent provide the legal foundation for a GAL to serve both as the GAL and as the minor's attorney—to present evidence and to advocate on the minor's behalf as the GAL did in this case—there is no basis to conclude that the trial court erred in allowing K.M.'s GAL to do so.

¶ 101           D. Admission of the Best-Interest Report and a Police Report

¶ 102   Adriana claims that the trial court erred by admitting the two documents into evidence before the best-interest hearing. The State argues that the best-interest hearing has relaxed evidentiary standards and Adriana fails to provide support for her claim that admission constituted a due process violation.

¶ 103   "Illinois court have held that the rules of evidence to be applied in civil cases also apply to parental rights termination proceedings." *In re J.B.*, 346 Ill. App. 3d at 81; see also 705 ILCS

32

405/2-18(1) (West 2022) ("The standard of proof and the rules of evidence in the nature of civil proceedings in this State are applicable to proceedings under this Article."). A trial court's decision to either admit or deny evidence during a parental rights termination hearing will be affirmed unless the court abused its discretion. *In re J.B.*, 346 Ill. App. 3d at 80. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Caffey*, 205 Ill. 2d at 89.

¶ 104   The trial court overruled Adriana's objection to the two documents, citing to *In re Jay. H.*, 395 Ill. App. 3d 1063 (2009). In this case, the appellate court stated that the dispositional hearing under the Juvenile Court Act and the best-interest hearing under the Adoption Act are functionally equivalent. *Id.* at 1069-70.

> "These respective second steps are subject to the same relaxed standard regarding the admission of evidence—that is, the formal rules of evidence do not apply. Thus, at both second-step hearings, all evidence helpful (in the trial court's judgment) in determining the questions before the court may be admitted and may be relied upon to the extent of its probative value, even though that evidence would not be admissible in a proceeding where the formal rules of evidence applied." *Id.* at 1070.

Accordingly, the trial court did not err in allowing the disputed document into evidence.

¶ 105   With respect to Adriana's due process argument, the United States Supreme Court has also identified three factors to consider in determining what due process requires:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal

and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In applying these three due process factors here, we conclude that Adriana's due process rights were not violated. As K.M.'s parent, she did have a private interest in maintaining her parental rights. Adriana was not at risk of the erroneous deprivation of her parental rights by the admission of the best interest and police reports at the best-interest hearing. The best-interest report is similar to the service plans and indicated reports that are always permissible despite containing potential hearsay. See 705 ILCS 405/2-18(4)(a), (b) (West 2022). The police report was not hearsay, as it was not being offered for the truth of the matter asserted, but to demonstrate that Adriana was potentially in a relationship not disclosed to Hutson at One Hope. Finally, we find that the People of the State of Illinois maintain a strong interest in guaranteeing that K.M. receives what is best for her by ensuring that as much relevant information is available for the trial court to consider in making its decision.

¶ 106                              E. Order Finding Adriana Unfit

¶ 107    The legal authority for the involuntary termination of parental rights in Illinois is found in the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) and in the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). See *In re J.L.*, 236 Ill. 2d 329, 337 (2010) (citing *In re E.B.*, 231 Ill. 2d 459, 463 (2008)). The procedural basis for the involuntary termination of parental rights is found in section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2022)). The procedure involves two steps. With step one, the State must prove, by clear and convincing evidence, that the parent is an "unfit person" as defined by the Adoption Act. *Id.*; 750 ILCS 50/1(D) (West 2022); *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994). If the trial court finds that the parent is unfit, the process moves to step two. With step two, the State must prove, by a

preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. 705 ILCS 405/2-29(2) (West 2022); *In re J.L.*, 236 Ill. 2d at 337-38. On appeal from a trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the reviewing court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). The trial court's finding of unfitness is given great deference because it had the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented. *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28 (citing *In re Joseph M.*, 398 Ill. App. 3d 1086, 1089 (2010)); *In re S.R.*, 326 Ill. App. 3d 356, 360-61 (2001).

¶ 108   We must give great deference to the trial court's finding of unfitness as the court was able to evaluate the demeanor and testimony of Adriana and the other witnesses. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064).

¶ 109   We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Adriana was an "unfit person." The trial court determined that the State met its burden of proof on the following three bases: failure to maintain a reasonable degree of responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2022)); failure to make reasonable efforts to correct the conditions that were the basis for the removal of the child from her during the nine-month period set forth by the State in its motion (*id.* § 1(D)(m)(i)), and failure

35

to make reasonable progress toward the return of the minor to her during the nine-month period set forth by the State in its motion (*id.* § 1(D)(m)(ii)).

¶ 110   To determine if a parent has shown a reasonable degree of responsibility for a minor's welfare, the court "considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare." *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). The court can also consider evidence that the parent completed his or her service plan as establishing the parent's responsibility. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1065). A parent's effort is more important than a parent's success with the service plan objectives. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)). "In this regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d at 278). "We are mindful *** that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child." *Id.* (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Instead, the court must objectively assess whether the responsibility is reasonable. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064).

¶ 111   The court found that Adriana failed to maintain a reasonable degree of responsibility as to the child's welfare during the specific nine-month period (May 25, 2023, to February 25, 2024), The court noted that Adriana exhibited appropriate interest and concern for K.M. She completed most of her service plan objectives. The court noted that she always had appropriate housing. She also maintained employment, although she frequently changed jobs. Most importantly, the court noted that she was consistent with her visits. However, the court emphasized that Adriana's visits never fully advanced to unsupervised due to Adriana's ongoing pattern of dishonesty about her contact with Gaige and ongoing incidents of domestic abuse between Adriana and Gaige. The

36

court noted at least six incidents of contact between her and Gaige during the nine-month period. In addition, Adriana attempted a seventh contact by phoning Gaige from the courthouse bathroom. All of these contacts occurred during a time when the court had entered a no-contact order and/or Adriana had separately obtained an order of protection against Gaige. The court stated that Adriana did not deny these seven incidents of contact, although she factually framed them differently than the police reports and/or other witness reports. The court discussed each contact and acknowledged that Adriana admitted to them but attempted to minimize each contact by calling them "mistakes." The court specially found that Adriana's testimony was not credible. Surmising that there were likely far more than the seven contacts in the specific nine-month period, the court stated: "unfortunately, that's just more than enough to show that Adriana doesn't get it. And she was willing to repeatedly violate the Court's orders and was certainly not applying what was attempting to be taught to her in the plenty of services that she took and even completed." In finding that Adriana did not demonstrate a reasonable degree of responsibility as to K.M.'s welfare, the court stated:

"Adriana has by her repeated actions to disregard the Court's orders in this case and in the OP case referenced earlier by continuing to have contact with Gaige, continuing to have incidents of domestic violence with him, and then concealing, minimizing, and lying about it, she's demonstrated a clear lack of responsibility as to [K.M.]'s welfare and, for that matter, a lack of responsibility as to her own betterment, which would, of course, also be to the benefit of [K.M.]."

¶ 112    The court also found that during the nine-month period (May 25, 2023, to February 25, 2024), Adriana failed to make reasonable efforts to correct the conditions that were the basis for K.M.'s removal. The court noted that Adriana grew up in the foster care system herself and

37

referenced her completion of her service plan objectives and positive visits with K.M. However, Adriana maintained her contacts with Gaige despite knowing that she risked being found unfit for doing so. Through her services, Adriana was given the tools to make better choices, and "she instead repeatedly made the wrong choice." The court stated that these wrong choices were the basis of the court's finding that the State established by clear and convincing evidence that she failed to make reasonable efforts to correct the conditions that were the basis of K.M.'s removal from her care. The court noted Adriana's testimony during the hearing that while she had been trained in how to handle difficult anger management and domestic violence moments, it was hard to apply those skills in certain situations. The court stated: "the whole point of learning in these services is so that you can apply what you've learned in the moment. And there were just way too many occasions where whatever might have been learned in those services certainly was not applied."

¶ 113    Finally, the court found that during the nine-month period (May 25, 2023, to February 25, 2024), Adriana failed to make reasonable progress toward the return of K.M. Again, the court noted Adriana's completion of service tasks and her visits with K.M. The court stated:

> "[W]hat kept Adriana's progress from being reasonable progress toward the return of [K.M.] home are her actions during this nine-month period that we've already discussed: The repeated instances of contact between Adriana and Gaige, the domestic violence and volatility that continued between them, and her unwillingness to take the steps that she knew she needed to take. As a result, as referenced earlier, her visits could not progress, and as of February 25, 2024, Adriana was not anywhere near having [K.M.] returned to her. Nor was she, unfortunately, close to that at any point in the case."

The court found that the State established by clear and convincing evidence that Adriana failed to make reasonable progress toward K.M.'s return during the specific nine-month period.

¶ 114    Having thoroughly reviewed the extensive record, we find no basis to conclude that the trial court's finding that Adriana was an unfit parent was against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d at 104.

¶ 115                                   F. Best-Interest Hearing

¶ 116    Termination of a parent's rights is a difficult and final step. *In re Adoption of Syck*, 138 Ill. 2d at 274-75. Parents maintain the important right to raise their own children. *Id.* However, when a parent has been declared "unfit," "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. The interests of the parent and the child remain concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship' " until the court declares that the parent is unfit. *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

¶ 117    At the best-interest hearing, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2022); *In re D.T.*, 212 Ill. 2d at 366. We review the trial court's best-interest decision with the manifest weight of the evidence standard. *In re Jay. H.*, 395 Ill. App. 3d at 1071; *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill.

App. 3d 739, 748 (2000). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must analyze several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2022). Those factors include: "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachments, including: (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued); (ii) the child's sense of security; (iii) the child's sense of familiarity; (iv) continuity of affection for the child; (v) the least disruptive placement alternative for the child; (e) the child's wishes and long-term goals; (f) the child's community ties, including church, school, and friends; (g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child." *Id.* The trial court is not required to make an explicit finding on each of the best-interest factors. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 33 (citing *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19); *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991)). Another factor the trial court may consider is the likelihood of adoption. *In re Tashika F.*, 333 Ill. App. 3d at 170.

¶ 118 During the best-interest hearing, One Hope caseworker Hutson testified that she had become aware of an Arlington Heights police case involving Adriana and the impoundment of a

40

vehicle in December 2024. Hutson testified that Adriana denied that any one was living with her, but Hutson indicated that there was a possibility of a man living with her based upon Adriana's consistent use of a green Jeep to get to some court hearings and visits with K.M. Sometimes a man is driving the Jeep, and other times Adriana is driving the Jeep. One Hope located a photograph of Adriana kissing this same man. Adriana simply stated that the man was a friend who knew how important it was for her to maintain her regular visits with K.M. The concern was that if this is Adriana's paramour, then she needed to disclose the relationship and have him submit his information for a DCFS background check because he would need to be cleared to be with or around K.M.

¶ 119   Faith Whitman testified at the best-interest hearing. She said she was willing to adopt K.M. if that became possible. She described her home and K.M.'s bedroom and "school room." She testified to the extended family gatherings that included Gaige's relatives. She said that at present, she did not believe that she could include Adriana in K.M.'s life, but said that as K.M. got older, that could change.

¶ 120   We find that the trial court carefully reviewed and considered the best-interest factors before concluding that the State established by a preponderance of the evidence that termination of Adriana's parental rights was in K.M.'s best interest. Although Adriana and K.M. have a bond, that bond was outweighed by the benefits set forth in the statutory factors. We conclude that the record clearly established that termination of Adriana's parental rights was the appropriate outcome for K.M., and we conclude that the trial court's order terminating Adriana's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 121                               III. CONCLUSION

¶ 122   For the above reasons, we affirm the trial court's fitness and best-interest orders.


¶ 123   Affirmed.